IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No.  05-cv-02415-RPM

TU ANH DINH,

    Plaintiff,

v.

STANDARD INSURANCE COMPANY,
an Oregon Corporation,

    Defendant.

---

MEMORANDUM OPINION AND ORDER

---

On August 3, 2003, Tu Anh Dinh submitted her claim for long-term disability (LTD) benefits as an employee of Ariana Human Resources, a corporation she owned. Standard Insurance Company issued a group policy to that corporation and was the claims administrator of the group benefits plan, governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq.*  Ms. Dinh also completed the employer's statement submitted to Standard.  In the employee statement she identified her disability as "brain injury, cognitive impairment, severe headaches, severe hip injury, neck, shoulder and lower back!  Unable to focus, concentrate and prioritize.  Loss of memory."  She wrote that the cause of injury was "car accidents" on December 7, 2001, and April 25, 2002.  R. 547.  The employee statement listed two dates, December 6, 2001, and April 24, 2002, as "the last full day at work."  R. 548.  The same

dates were given as the last days of work before disability on the employer's statement.

Ms. Dinh wrote a note accompanying these forms, saying:

> I, Dinh T. Tu Anh, did not file for my disability insurance claim earlier because due to the two auto accidents, resulting in my brain injury, along with other physical injuries greatly impaired by ability to function and my judgement.  R. 543.

Ms. Dinh identified her attending physicians as Dr. Larry Eckstein, M.D.; Dr. Keith Swan, D.O. and Dr. Mark Pendleton.

The plaintiff worked for many years as a professional executive recruiter with annual earnings between $273,000 and $494,000 in some years.

Dr. Swan, an osteopathic physician treating Ms. Dinh, submitted an attending physician's statement to Standard, dated August 4, 2003, identifying headaches, left hip pain and low back pain as symptoms for his diagnosis of "...somatic dysfunction-pelvic (primary), cephalgia-post traumatic (secondary), somatic dysfunction-lumbar and somatic dysfunction-cranial."  R. 555.

Dr. Swan described his treatment as osteopathic manipulation 1-2 times per week from November 19, 2002, to July 31, 2003.

Dr. Pendleton, a neuropsychologist, submitted his statement to Standard, dated August 6, 2003, giving his diagnosis as cognitive disorder NOS, post-traumatic stress disorder, chronic, and traumatic brain injury.  R. 560.  Dr. Pendleton also submitted a letter describing his observations and the following conclusion:

> In conclusion, the patient's overall level of functioning on our neuropsychological battery is well within the range characteristic of previous patients who have not been able to obtain and hold competitive employment.  She appears to be only marginally employable at this time,

>although this should improve with treatment, and she should return to
>being more employable in the future.  If she does attempt to return to work
>in the interim, it would be best to begin on a limited, part-time basis and
>take careful steps to compensate for cognitive issues as outlined above.
>R. 557.

On November 26, 2003, Steven D. Poindexter, Standard's claims analyst, wrote a letter denying the claim of Ms. Dinh, saying that the information provided together with medical file reviews by Standard's consultants did not provide sufficient support for the claim of disability.  R. 813-808.  The plaintiff requested an administrative review through her attorney, who submitted additional medical records and evaluations.  The claim was again denied by Mr. Poindexter in a letter dated November 11, 2004.  R. 1234-1227.  Mr. Poindexter wrote that the claim would be referred to Standard's Quality Assurance Unit for further review and analysis by an individual not involved in the original decision, who would consult with an appropriate medical professional.  R. 1227.  By letter dated February 18, 2005, Linda Wheeler, Standard's representative, wrote to plaintiff's counsel, affirming the denial of the claim for benefits.  R. 1366-1362; 1343-1328.

The plaintiff then filed this civil action for ERISA benefits on November 29, 2005.  The complete claim file has been submitted and reviewed pursuant to the sliding scale of deference to the insurance company's decision mandated by *Fought v. Unum Life Ins. Co. of America*, 379 F.3d 997 (10th Cir. 2004).

*Fought* is applicable because Standard has an inherent conflict of interest as both claims administrator, with discretionary authority to determine eligibility for benefits, and is the payer of those benefits.  Thus, the judicial review under the

arbitrary and capricious standard morphs into a requirement that Standard prove the reasonableness of its denial decision by showing that it is supported by substantial evidence in the administrative record. *Fought* directs decreased deference to the claims administrator's decision when serious procedural irregularities are shown.

The plaintiff asserts that because there were multiple procedural irregularities in the handling of her claim, almost no deference is due under the sliding scale. She argues that Standard bears the burden of proof by a preponderance of the evidence that Ms. Dinh was not disabled at any time during the period of coverage of this policy. That argument is not supported by *Fought*. The sliding scale of deference directed by the court in that case does not change the standard of review under ERISA.

The question before this court is whether the denial of benefits is supported by substantial evidence in the claims record and results from a proper application of the language of the plan. Procedural irregularities are relevant as affecting the extent of the influence of bias from the conflict of interest in the administrator's evaluation of the claimant's mental and physical condition.

After a searching review of the voluminous record, the court finds that Standard did not give full and fair consideration to the medical records and opinions of health care providers and consultants supporting the claim for disability benefits and the denial decision was not supported by substantial evidence. Accordingly, it was not reasonable.

Ms. Dinh's application for LTD was made under the following provision of the plan:

4

> Until LTD Benefits have been paid for 24 months, you are Disabled if, as a result of Sickness, Accidental Bodily injury, or Pregnancy, you are either:
>
> a.  Unable to perform with reasonable continuity the material duties of your own occupation; or
>
> b.  Unable to earn more than 80% of your Indexed Predisability Earnings while working in your own occupation.
>
> After LTD benefits have been paid for 24 months, you are Disabled if, as a result of Sickness, Accidental Bodily Injury, or Pregnancy, you are either:
>
> a.  Unable to perform with reasonable continuity the material duties of any gainful occupation for which you are reasonably fitted by education, training, and experience; or
>
> b.  Unable to earn more than 50% of your Indexed Predisability Earnings while working in your own or any other occupation.
> R. 27.

The record reflects the Plaintiff's occupation as an executive level recruiter whose earnings were substantial. The maximum payment under the Select Trust insurance policy is $2,500 per month during the period of disability.

The record under review is filled with ambiguity and uncertainty. The policy coverage terminates when a "member" is not regularly scheduled to work at least 30 hours each week. R. 14. As previously noted, Ms. Dinh showed the two dates immediately preceding her automobile accidents as last days worked and the medical records reflect her conflicting statements to treating and consulting doctors as to her work activities after December 7, 2001. Standard accepted premiums up to August 31, 2003. It is accepted that coverage extended to April 27, 2002, and the disability

determination depends upon her condition up to that date.

Ms. Dinh first sought medical treatment after her December collision from her primary care physician, Dr. Larry Eckstein on December 14, 2001, complaining of a dull ache in her lower back, a sharp pain in her hip, insomnia, stiff neck, hypervigilance and fatigue. Dr. Eckstein diagnosed a cervical thoracic strain, myofacitis with spasm, sacral strain, costochondritis and sleep disturbance with fatigue. R. 467. Conservative treatment was recommended.

On May 1, 2002, following the rear-end collision, Ms. Dinh reported to Dr. Eckstein that she was feeling head trauma and had a cognitive problem with loss of focus and reduced concentration, neck pain and headaches. The doctor added L-5 strain and headaches to his prior diagnosis.

Amica Insurance, the no fault insurance provider for Ms. Dinh, sent her to Dr. Gary L. Cook, Ph.D., D.O., for an IME, which he conducted on June 1, 2002. Dr. Cook reported a diagnosis of chronic pain syndrome (fibromyalgia) secondary to cervicothoracic lumbosacral strain/sprain injury sustained in the initial motor vehicle accident and exacerbated by the April 25, 2002, accident. Dr. Cook stated that Plaintiff's diagnosis and symptoms fit with her "history of being strongly shaken during the initial motor vehicle accident, and having it aggravated during the second motor vehicle accident." R. 535-528.

On July 15, 2002, Dr. Eckstein diagnosed "cognitive dysfunction" and on November 15, 2002, opined that Ms. Dinh could not work due to "difficulty with mental concentration and organization, a prime requirement in her profession." R. 499.   He

repeated that diagnosis on December 2, 2002, and referred her to Mary Ann Keatley, Ph.D., who saw the plaintiff in March, 2003, for a "cognitive-linguistic evaluation." Dr. Keatley is a "neurotherapist." She performed cognitive testing and reported deficits affecting Ms. Dinh's ability to work which were said to be consistent with a "post concussive-type injury" and Dr. Keatley recommended cognitive-linguistic" treatments for a period of 12 weeks. R. 526-520.

Upon referral from Dr. Eckstein and Dr. Keatley, Mark Pendleton, Ph.D., a clinical psychologist, conducted a neuropsychological evaluation of Ms. Dinh and wrote a report, dated May 28, 2003. He found that there were mild impairments making her only marginally employable but that she should benefit from "psychotherapy and psychotropic medication." R. 501. Dr. Pendleton's DSM IV diagnosis was Cognitive Disorder NOS due to mild Traumatic Brain Injury and Post Traumatic Stress Disorder. R. 503.

The plaintiff saw Dr. Gayle Bereskin, D.O., for another IME for Amica. Dr. Bereskin conducted an osteopathic examination and found Ms. Dinh's subjective complaints supported by objective findings on the physical examination and that the "severe head-on collision resulting in a severe whiplash injury" supported a diagnosis of post traumatic stress disorder resulting in cognitive impairment. R. 514. Dr. Bereskin
also believed that the recommended therapy should enable Ms. Dinh to "achieve normal activities of daily living and a normal work status." R 511.

Dr. Lynn Parry, a neurologist, examined Ms. Dinh on October 14, 2003. In a

report to Amica Insurance, Dr. Parry found post traumatic stress disorder and agreed with Dr. Pendleton's assessments but suggested that intensive cognitive therapy was contraindicated and will actually increase the plaintiff's distress.  She was found to be not capable of the "cognitive high-pressure work that she was doing prior to her injuries."  R. 787.

Dr. Philip Sutton, Ph.D., a clinical psychologist, did an IME for Amica and wrote a report dated January 27, 2004.  His diagnosis was PTSD, Post Concussive Syndrome and Chronic Pain Syndrome which resulted from both accidents and left her only marginally employable but eventually she may be able to return to some level of employment.  R. 1299-1296.

Another IME for Amica was performed by Dr. Eric Westerman, D.O., on August 12, 2004.  He reviewed extensive medical records and conducted a physical examination.  Dr. Westerman reported that Ms. Dinh's subjective complaints were supported by objective findings and that she was not employable.  R. 1173-1169.

In November, 2003, Donald Taylor, Ph.D., a clinical neuropsychologist, did an IME for Northwestern Mutual, an insurer on an unrelated disability insurance policy. His report, dated November 29, 2003, described his review of the medical records of those who had seen the plaintiff, his interviews of her, the results of his psychological testing and the traffic accident report of April 25, 2002.  Dr. Taylor discounted his neuropsychological testing and that of Dr. Pendleton as being compromised by disingenuous or inadequate test taking effort and exaggeration of somatic complaints. Dr. Taylor found chronic pain was the overriding problem and recommended evaluation

and treatment in a multidisciplinary pain clinic.  R. 867-856.

In his November 26, 2003, initial denial letter, Mr. Poindexter referred to an unidentified physician consultant's opinions.  That was Dr. Elias Dickerman, a neurologist, who conducted a records review and issued a report dated September 30, 2003.  In his report, Dr. Dickerman summarized his views of the reports of Dr. Keatley, Dr. Pendleton, Dr. Cook and Dr. Bereskin.  Dr. Dickerman concluded that Ms. Dinh did not have a significant injury from either motor vehicle accident; that she has a chronic pain syndrome and there was no evidence of a significant or well established cognitive deficit.  He also questioned a diagnosis of post traumatic stress disorder.  R. 978.  Dr. Dickerman recommended an evaluation by a neuropsychologist and perhaps a psychiatrist.

Standard sent the records to Dr. Jeffrey Powel, Ph.D., a clinical psychologist, who believed that the records did not sustain a diagnosis of traumatic brain injury or cognitive limitations and strongly suggested malingering.  R. 844-835.  In his report of November 6, 2003, Dr. Powel said that he would defer to a psychiatric consultant with respect to the claimant's emotional status.

Standard submitted records to Dr. Linda Toenniessen, a psychiatrist, who issued a report dated November 17, 2003, consisting of two pages, saying that in the absence of a psychosocial history she could not make a psychiatric diagnosis.  She essentially accepted Dr. Dickerman's and Dr. Powel's reviews and said, "We need psychiatric history and a mental status examination."  R. 796.

Dr. Parry wrote a 9-page memorandum, dated May 17, 2004, criticizing the assessments made by the consultants to Standard and Nationwide [sic]. Dr. Parry continued to opine that Ms. Dinh was unable to work and described the work activities she did as a recruiter in some detail. Dr. Parry again emphasized that the primary diagnosis was mild traumatic brain injury with significant vestibular and visual dysfunction. R. 965-957.

Counsel for Ms. Dinh appealed the denial decision by letter dated March 9, 2004. R. 895. Additional information was submitted to Standard and the file was again referred to Dr. Toenniessen who issued a memo dated September 13, 2004. Dr. Toenniessen said she reviewed Dr. Powel's evaluation and information from Dr. Parry. Dr. Toenniessen believed there was evidence that the claimant was overstating her symptoms and again stated that there was no compelling evidence of a psychiatric disorder. R. 1197.

The Taylor report was also reviewed by Dr. Dickerman who reported in a memorandum dated September 15, 2004, with comments on letters from Dr. Keatley, the Dr. Sutton evaluation and Dr. Parry's lengthy letter. Dr. Dickerman concluded that there was no current medical documentation supporting Ms. Dinh's inability to perform full-time work in her own occupation. The tone of his letter was dismissive and attributed the diagnoses made by others as invalid because they were on subjective complaints that were embellished. R. 1203-1200. Dr. Dickerman wrote that the file did not support a finding that she was precluded from performing full time work in any occupation and was capable of sedentary to light capacity activities. He did not show

any awareness of the job requirements detailed in Dr. Parry's report.

The appeal was referred to Standard's Quality Assurance Unit after Mr. Poindexter wrote on November 11, 2004, that the denial decision would not be changed. The file was referred to Dr. Lawrence Zivin, a neurologist, who issued a report on January 5, 2005, based on his medical records review. R. 1349-1344. Dr. Zivin described Ms. Dinh as having operated an "executive accounting business" and had motor accidents in December, 2001, and May 25, 2002. That error in dates caused him to say that any accretions of impairment attributable to the second motor accident was "out of bounds" because it was after the coverage ended.

Standard also asked for a review by Dr. Esther Gwinnell, a psychiatrist, whose report appears at R. 1361-1358. She agreed with Dr. Toenniessen's assessment and suggested malingering.

Under date of February 18, 2005, Linda Wheeler, Standard's Review Specialist, wrote to plaintiff's counsel, denying the claim for benefits on behalf of the Quality Assurance Unit. R. 1366-1362; 1343-1328.

Ms. Wheeler summarized the reports and records discussed above. She quoted extensively from the reports of Dr. Powel and Dr. Taylor. Standard relied heavily on Dr. Dickerman's criticisms of the plaintiff's treating and consulting physicians and psychologists. The views expressed by Dr. Toenniessen, Dr. Gwinnell and Dr. Zivin were cited to support discounting the opinions of Dr. Parry. The reviewer recognized that Ms. Dinh had been awarded Social Security Disability benefits but discounted that

fact with a comment that the agency did not have all of the records considered in Standard's review.

The ultimate conclusion expressed in the final denial letter is in the following paragraph:

> After completing a comprehensive review of Ms. Dinh's claim file, including all of the information discussed above, The Standard continues to find that there is insufficient medical evidence to support that Ms. Dinh was at any time while insured by The Standard, unable as a result of Sickness, or Accidental Bodily Injury to perform the material duties of her own occupation as an executive recruiter.  More specifically we find that Ms. Dinh's report of physical symptoms and cognitive complaints, which have not substantially improved despite extensive treatment, is inconsistent with the characteristics of her two motor vehicle accidents. As discussed throughout this letter, we also do not find convincing medical evidence to support that your client has a brain injury, a severe musculoskeletal condition, a disabling psychiatric condition, or definitive cognitive deficits.  R. 1329

There is nothing in the record to indicate that Standard made any effort to determine the requirements of the Plaintiff's occupation.  None of the consultants who reviewed the medical records for Standard showed any awareness of the skills and cognitive capabilities required for the work Ms. Dinh was doing before the accident of December 7, 2001.  They appeared to be evaluating her ability to be gainfully employed in any occupation which would be relevant only for eligibility for benefits after the first 24 months of disability.  The claims analysts' denial letters failed to make that distinction as well.

Standard also failed to show any recognition of the fact that Ms. Dinh was, in reality, self-employed as the owner of the corporation that obtained the insurance policy.  Accordingly, her "own occupation" job skills included her ability to manage the

business. That fact defeats any contention that the Plaintiff ceased to be a "member" covered by the insurance based on December 6, 2001, as the last day of employment. Since she scheduled herself to work and tried to continue to work between the two motor vehicle accidents, as reflected in the treatment notes of Dr. Eckstein. She was a member on the date of the second accident, April 25, 2002.

It is apparent that Mr. Poindexter approached Ms. Dinh's application with considerable skepticism. That is understandable because the application was made 15 months after the second accident and Ms. Dinh used both accidents as the onset dates for her disability. As the claim progressed with medical information provided, initial skepticism was no longer warranted as the reasons for her confusing statements came to light. Those who sought to explain her continuing pain and other signs of disability had difficulty explaining the causes because her condition was different from what would be expected to result from the mechanics of these two events.

A core question in this case is whether Ms. Dinh sustained traumatic brain injury in either or both of these accidents. The collision of December 7, 2001, did not produce obvious head trauma. There was no external injury to her head and she did not lose consciousness. There was no report of direct head injury in the rear-end collision on April 25, 2002, and while she described the speed of the colliding vehicle as 35 m.p.h., there was no road debris reported.

There is evidence to support the view that movements of the brain within her skull produced the same effects as a more obvious concussion from a blow to the head. There is general agreement that such movements can cause brain injury. An additional

question is whether these events were so traumatic emotionally as to justify a diagnosis of post traumatic stress disorder.  A key question is whether the plaintiff's complaints of pain are genuine.  While the denial letter of February 18, 2005, does not expressly accuse Ms. Dinh of malingering, that is the view of Dr. Dickerman and Dr. Powel, the consultants on whom the defendant placed principal reliance and inferentially adopted as the view accepted by Standard.

Standard did not request an independent medical or psychological examination of Ms. Dinh.  The plaintiff cites that fact as one of the procedural irregularities. Standard responded by observing that the late filing of this application denied it the opportunity to do such an evaluation when it would be most meaningful and Standard did consider the reports of the IME examinations done at the request of Amica Insurance and Northwestern Mutual.

The plaintiff notes that Standard was very selective in what it considered in the reports from Dr. Cook, Dr. Bereskin, Dr. Sutton, Dr. Westerman and Dr. Taylor. Indeed, the defendant's consultants were critical of those conclusions that supported a disabling condition.

The tone of the reports of the consultants to Standard was distinctly defensive. Dr. Dickerman's comments reflected a bias against subjective complaints as a basis for a medical diagnosis.  He consistently emphasized testing and the lack of objective findings in the medical records he reviewed.  Dr. Powel was obviously influenced by Dr. Dickerman's report of September 30, 2003, and relied heavily on literature concerning the prevalence of malingering and secondary gain in self reporting of signs and

symptoms in traumatic brain injury litigation. His emphasis was on what is expected in recovery from the effects of mild brain trauma, as compared with Ms. Dinh's complaints without any recognition that the individual circumstances of Ms. Dinh may present a valid exception to his statistical model.

The consultants used by Standard to evaluate Ms. Dinh's claim of disability were dismissive and highly critical of the opinions of those who had provided the diagnoses supporting her claim. There is a marked contrast between the views of those who actually saw her and those who only looked at records. A fair inference from the record is that all those who reviewed this application for Standard had a bias against it and were predisposed to reject the views of those who supported Ms. Dinh.

In all three denial letters, Standard described Ms. Dinh's employment as "executive recruiter." Mr. Poindexter in his two letters wrote that she was employed in a "sedentary to light level occupation." Nowhere in the denial letters is there any recognition of what was required of the plaintiff to perform as a sole proprietor of a business that Dr. Parry described as "competitive" and "cognitive high pressure work." R. 787. It is counter-intuitive to believe that Ms. Dinh would stop working in her successful business, endure all of the attempts at testing, diagnosis and treatment to obtain monthly benefits of $2,500 from Standard Insurance Company. The denial of those benefits under the own occupation standard of disability was not reasonable.

The plaintiff seeks recovery of those benefits and also asks that this court order payment of LTD benefits under the "any occupation" coverage until Standard can stop payment by showing such improvement that she could obtain employment in any

gainful occupation in which she could earn more than 50% of her "Indexed Predisability Earnings."  R. 27.  That issue was not specifically addressed in the handling of this claim.  This court's analysis of the record was limited to the "own occupation" standard.  There is a question of what Ms. Dinh's predisability earnings were under the policy definition which is for the year preceding the last full day of active work.

While Ms. Dinh's application was made four years ago and there is a strong temptation to provide a more complete remedy, there is no authority for this court to pre-empt the plan provisions by precluding administrative review of the claim for LTD benefits beyond what was due for the 24 months coverage together with interest and attorney's fees.

Upon the foregoing, it is

ORDERED, that Tu Anh Dinh shall be paid the unpaid benefits due to her on her application for Long Term Disability Benefits for the first 24 months of disability, together with interest thereon and attorney's fees in an amount to be determined, and it is

FURTHER ORDERED, that counsel shall meet and confer as to the amount to be awarded and submit their agreement or dispute to this court on or before August 31, 2007, together with a proposed schedule for submission of a motion for attorney fees and any objections to it in accordance with D.C.COLO.LCivR 54.3.

Dated: August 7th, 2007

BY THE COURT:

s/Richard P. Matsch
Richard P. Matsch, Senior District Judge